# In the United States Court of Federal Claims

No. 16-863C
(Filed: September 28, 2016)*
**\*Opinion originally filed under seal on September 23, 2016**

| | |
|---|---|
| AEGIS TECHNOLOGIES GROUP, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| COLE ENGINEERING SERVICES, INC., | ) ) ) |
| Defendant-Intervenor. | ) ) ) |

Post-Award Bid Protest; Motion for Judgment on the Administrative Record; RCFC 52.1; Organizational Conflict of Interest; Cost Realism; Technical Risk; Past Performance; Unequal Evaluation

---

*Richard J.R. Raleigh, Jr.*, Huntsville, AL, for plaintiff.  *Jerome S. Gabig, Jr.*, Huntsville, AL, of counsel.

*James R. Sweet*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for defendant.  *Sean M. Hannaway*, Chief, Theater C2 Programs Division, Office of the Staff Judge Advocate, Hanscom Air Force Base, MA, of counsel.

*Jon D. Levin*, Huntsville, AL, for defendant-intervenor.  *W. Brad English*, *J. Andrew Watson, III*, and *Emily J. Chancey*, Huntsville, AL, of counsel.

**O P I N I O N**

Pending before the court in this post-award bid protest are a motion for judgment on the administrative record and for permanent injunctive relief filed by AEgis Technologies Group, Inc. ("AEgis") and cross-motions for judgment on the administrative record filed by defendant the United States ("the government") and defendant-intervenor Cole Engineering Services, Inc. ("Cole"), pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), in connection with the decision of the Air Force Material Command, Air Force Life Cycle Management Center, Hanscom Air Force Base, Massachusetts ("the Air Force") to award a contract to Cole under solicitation no. FA8730-15-R-0026 ("the solicitation").  The award is for an indefinite delivery indefinite quantity ("IDIQ") contract of up to $67.32 million over five years to provide support services for the Air Force Modeling and Simulation Training Toolkit ("AFMSTT") program.  Administrative Record ("AR") 345.

In its complaint and pending motion, AEgis, which was the incumbent contractor for the past six years, argues that the Air Force's award of the IDIQ contract to Cole must be overturned on several grounds.  AR 78, 650, 2403, 2407, 3077-81.[1]  First, AEgis claims that the award needs to be set aside because one of Cole's proposed subcontractors, Booz Allen Hamilton ("Booz Allen"), has a significant organizational conflict of interest ("OCI") that the Air Force has failed to address in violation of Federal Acquisition Regulation ("FAR") subpart 9.5.  Second, AEgis claims that the Air Force

---

[1] At the July 25, 2016 status conference, government represented that work under the current contract will continue with AEgis's existing employees until September 30, 2016.

failed to adequately explain its cost realism assessment of Cole's proposal or consider Cole's lower cost in assigning technical risk ratings. Finally, AEgis argues that the Air Force erred in its past performance evaluation by giving too much weight to the past performance of Cole's proposed subcontractors and by failing to give AEgis sufficient credit for its more relevant past performance.

For the reasons below, the court finds that AEgis has not provided hard facts showing significant OCI that would warrant further review by the contracting officer and that the Air Force's cost realism, technical risk, and past performance evaluations are all supported by the administrative record. Accordingly, AEgis's motion for judgment on the administrative record and for permanent injunctive relief is **DENIED**. The government's and Cole's cross-motions for judgment on the administrative record are **GRANTED**.

I.      **BACKGROUND**

    A.      **Solicitation Background**

The AFMSTT program "is a set of software tools that provide a complete constructive simulated theater-level air warfare environment." AR 302. The AFMSTT "allows the [Air Force] to execute training exercises and mission rehearsal activities within a Joint Forces and cooperative partnership environment." AR 302. "AFMSTT tools continue to evolve to accommodate warfighting doctrine and environment, exercise/event frequency, type, and stakeholder needs. Some exercises/events are recurring and scheduled in advance while others may be one-time engagements." AR 302. The Air Force updates the AFMSTT program based on "change requests" and

"deficiency reports" submitted by the AFMSTT's operational users to the Air Force Agency for Modeling and Simulation ("AFAMS").  AR 302-04.[2]

As noted above, AEgis was the incumbent AFMSTT contractor for the past six years and was responsible for maintaining and making updates to the AFMSTT software. AR 78, 650, 2403, 2407, 3077-81.  Under a separate contract (contract no. GS-23-F-0025K, task order nos. GST0009AJ0018 and GSQ0015AJ0011), one of Cole's proposed subcontractors under the AFMSTT solicitation, Booz Allen, provided technical support to AFAMS by collecting and tracking change requests and deficiency reports, which were then provided to the AFMSTT contractor.  AR 302, 3011, 3015, 3177.  Booz Allen had its AFAMS contract from August 2009 to August 2015.  AR 3007, 3011.

The Air Force issued the AMSTT solicitation on September 3, 2015.  AR 7, 213, 2662.[3]  The solicitation was a small business set-aside and provided that the Air Force would make an award of one IDIQ contract on the basis of a "best value, tradeoff source selection conducted in accordance with FAR Part 15, as supplemented by the Defense Federal Acquisition Regulation Supplement (DFARS) Part 215, Department of Defense

---

[2] The solicitation explained that a "change request" is "[a] formal proposal from a user for a modification to the AFMSTT baseline.  The Government will prioritize all [change requests] and provide them to the contractor.  Operational or technical requirements drive all [change requests]."  AR 302.  The solicitation also stated that a "deficiency report" is "[a] formal proposal from a user identifying a deficiency resulting in a modification to the baseline.  The Government will prioritize all [deficiency reports] and provide them to the contractor. Operational or technical [deficiencies] drive all [deficiency reports]."  AR 302.

[3] The Air Force issued an amendment with administrative corrections on October 2, 2015 and another amendment with administrative corrections on November 4, 2015, after receiving proposals.  AR 7, 492, 528.

(DoD) Source Selection Procedures, Air Force Federal Acquisition Regulation Supplement (AFFARS) Part 5315, and AFFARS Mandatory Procedures (MP) 5315.3." AR 395.

The solicitation consisted of a mix of nine cost-plus-fixed-fee, cost-plus-fixed-fee level-of-effort, firm-fixed-price, and cost-reimbursable contract line item numbers ("CLINs" or "line items"). AR 216-23. The solicitation also included a model delivery order. AR 445. The solicitation provided that the government would evaluate offerors' proposed prices for the delivery order and issue the delivery order when it awarded the AFMSTT IDIQ contract. AR 534, 540.

The solicitation explained that the Air Force's award would be based on the evaluation of each offeror's proposed technical approach (including subfactors related to system development and sustainment, exercise/event support, and test and integration), cost/price, and past performance. AR 535. Recognizing that offerors would need the AFMSTT software code and similar information to make a proposal, the solicitation also included a "bidder's library" with all of the documents referenced in the solicitation, including AFMSTT future requirements and software code. AR 347, 349, 369, 3012, 3023.

The solicitation included the guidance described below regarding the Air Force's evaluation process. First, the solicitation stated that the Air Force would perform a cost realism analysis in accordance with FAR § 15.404-1(d) for each line item. AR 538-39.[4]

--------

[4] FAR § 15.404-1(d)(1) explains that "[c]ost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost

The solicitation further stated that the Air Force would create a "government estimate of most probable cost" ("GEMPC"), as determined by the cost realism assessment, for each line item based on the offeror's technical proposal.  AR 539.  The solicitation stated that the Air Force's cost realism evaluation would "consider the extent to which proposed costs indicate a clear understanding of solicitation requirements, and determine whether the proposal reflects an effective approach to satisfying those requirements and whether the proposed labor escalation and indirect factors are reasonable."  AR 539.  The solicitation noted that the cost realism evaluation for the cost-plus-fixed-fee level of effort line items "will be based on the skill mix but will not be adjusted above the Government directed Level of Effort (LOE) identified in the cost formats or the applicable H Clause."  AR 539.  The solicitation also noted that "[a] significant difference between the Offeror's proposed Cost/Price for cost type CLINs and the GEMPC will be considered an indicator that the Offeror does not understand the requirement and will be reflected in the Government's cost realism analysis."  AR 539.  The solicitation concluded that "[t]he GEMPC for the cost type CLINs, not the Contractor's proposed cost, will be used for the purpose of evaluation to determine the best value."  AR 539.

In its evaluation of offerors' technical proposals, the Air Force assigned "technical ratings" and "technical risk ratings" for each subfactor.  AR 535.  The solicitation stated

---

estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal."

that a technical rating "provides an assessment of the quality of the Offeror's solution for meeting the Government's requirement." AR 535. A technical rating of "good" means that the "[p]roposal meets requirements and indicates a thorough approach and understanding of the requirements." AR 536. A technical rating of "acceptable" means that the "[p]roposal meets requirements and indicates an adequate approach and understanding of the requirements." AR 536.[5]

With regard to technical risk ratings, the solicitation stated that the Air Force would assess the level of risk for each technical subfactor based on the "potential for disruption of schedule, increased costs, or degradation of performance, the need for increased Government oversight, or the likelihood of unsuccessful contract performance." AR 536. The solicitation provided that "[f]or any weakness identified, the evaluation shall address the Offeror's proposed mitigation and why that mitigation approach is or is not manageable." AR 536. Therefore, to earn a "low" risk rating on a technical subfactor, an offeror needed to show that its technical approach had "little potential to cause disruption of schedule, increased cost, or degradation of performance" and that "[n]ormal contractor effort and normal Government monitoring will likely be able to overcome any difficulties." AR 536.[6]

---

[5] The solicitation also defined technical ratings of "outstanding" for exceptional proposals, "marginal" for proposals that did not clearly meet requirements, and "unacceptable" for proposals that did not meet requirements and were unawardable. AR 536.

[6] A "moderate" risk rating meant that the offeror's proposed technical approach "[c]an potentially cause disruption of schedule, increased cost, or degradation of performance," requiring "[s]pecial contractor emphasis and close Government monitoring . . . to overcome difficulties." AR 536. A "high" risk rating meant that the offeror's proposed technical approach was "likely to cause significant disruption of schedule, increased cost, or degradation of

Finally, the solicitation stated that the Air Force would assign each offeror a performance confidence rating based on an assessment of the quality of recent, relevant past performance in accordance with FAR § 15.305 and DFARS § 215.305.  AR 540. The highest performance confidence rating, "substantial confidence," meant that "[b]ased on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort."  AR 541.  The solicitation explained that the government would make a single, overall quality assessment for each recent and relevant instance of past performance based on "an in-depth evaluation of all past performance information available, regardless of its source." AR 542.  The solicitation stated that the Air Force's assessment of whether cited past performance was relevant would include "major and critical subcontractor(s)."  AR 542. FAR § 15.305(a)(2)(iii) provides that a past performance evaluation "should take into account past performance information regarding . . . subcontractors that will perform major or critical aspects of the requirement."  Accordingly, the solicitation required each offeror to submit information about past performance "for the Offeror and all subcontractors at any tier, Inter-Divisional Transfers (IDT), teaming partners, and/or joint venture partners proposed to perform 25% or more of the effort based on the total proposed price, or proposed to perform aspects of the effort the Offeror considers critical to overall successful performance."  AR 355.

---

performance," making the approach "unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring."  AR 536.

## B.    Offers, Evaluation, and Award

The Air Force received six proposals in response to the solicitation.  AR 2879.

After an initial evaluation, the Air Force determined that AEgis's proposal, Cole's

proposal, and another proposal were considered to be awardable without discussions.  AR

2879.  The Air Force's ratings for AEgis and Cole are summarized as follows:

|  | **AEgis** | **Cole** |
|---|---|---|
| **Technical Subfactors** |  |  |
| System Development and Sustainment[7] | Good Low Risk | Good Low Risk |
| Exercise/Event Support[8] | Acceptable Low Risk | Acceptable Low Risk |
| Test and Integration[9] | Acceptable Low Risk | Good Low Risk |

---

[7] For the system development and sustainment technical subfactor, the Air Force identified "two strengths, no weaknesses or significant weaknesses" in AEgis's proposal and assigned AEgis a "low" technical risk rating.  AR 2879.  The Air Force assigned Cole a "low" technical risk rating for the system development and sustainment technical subfactor although the Air Force recognized that Cole's proposal required a cost adjustment, under the Air Force's cost realism evaluation, related to transitioning into the contract.  AR 2880.  However, the Air Force determined that this adjustment "was not meaningful enough to raise the risk rating above low as it only pertains to the first 90 day transition period and not the full 5-year contract period of performance."  AR 2880.

[8] The Air Force found that AEgis and Cole had "no strengths, weaknesses or significant weaknesses" for the exercise/event support technical subfactor.  AR 2882.

[9] The Air Force found that AEgis's "standard approach" under the test and integration technical subfactor presented "no strengths, weaknesses or significant weaknesses," and assigned AEgis an "acceptable" technical rating.  AR 2883.  The Air Force assigned Cole a "good" technical rating for the test and integration technical subfactor based on "two strengths, no weaknesses or significant weaknesses."  AR 2883.  The first strength was "that [Cole] proposed to create a representative environment (testbed) to perform realistic testing and allow for a stable AFMSTT system participation in the M&S federation testing cycles," which the Air Force found "will significantly reduce the risk to the Government and avoid[] rework."  AR 2883-84.  The second strength was related to Cole's proposed "comprehensive approach to the LINK-16/TADIL interface test and integration," which the Air Force found "will provide immediate feedback to the test team on the new TDL service functionality."  AR 2884.

|  | **AEgis** | **Cole** |
|---|---|---|
| **Past Performance**[10] | Substantial Confidence | Substantial Confidence |
| **Cost/Price** | | |
| Proposed Cost/Price | $3.87 million | $2.97 million |
| Cost/Price Realism Adjustment | 0 | $0.42 million[11] |
| Government Estimate of Most Probable Cost | $3.87 million | $3.39 million |
| Other Cost/Price Criteria | Reasonable Balanced Realistic | Reasonable Balanced Realistic |

AR 2885, 2887.

---

[10] AEgis earned a past performance rating of "substantial confidence" "based on three "Very Relevant" efforts (all three evaluated at a quality level of 'Very Good') and one 'Somewhat Relevant' effort (evaluated at a quality level of 'Very Good')." AR 2885-86. The Air Force noted that AEgis's "subcontractor performed one of the 'Very Relevant' efforts." AR 2886. The Air Force further noted that AEgis and its subcontractor had "shown experience with DoD M&S federations as well as experience in a Live, Virtual, and Constructive environment." AR 2886. Therefore, "[t]he Government has a high expectation that the AEgis will successfully perform the required effort."

Cole earned a past performance rating of "substantial confidence" "based on three 'Very Relevant' efforts (all three evaluated at a quality level of 'Satisfactory'), four 'Relevant' efforts (one evaluated at a quality level of 'Exceptional' and three at 'Very Good'), and two 'Somewhat Relevant' efforts (one evaluated at a quality level of 'Very Good' and one at 'Satisfactory')." AR 2886. The Air Force noted that Cole's "subcontractors have shown relevant work with 'Exceptional' and 'Very Good' ratings, and 'Very Relevant' work with 'Satisfactory' ratings." In addition, the Air Force found that Cole and its subcontractors had "shown extensive experience with DoD M&S federations as well as experience in a Live, Virtual, and Constructive environment." AR 2886. Therefore, "[t]he Government has a high expectation that [Cole] will successfully perform the required effort." AR 2886.

[11] The cost adjustment for Cole's proposal was based on the addition of 2,340 hours, at a cost of $368,212, for transitioning into the contract under line item 1 and 320 hours, at a cost of $54,472, for training and management under line item 3. AR 2515-19 (initial evaluation), 2843-45 (proposal analysis report), 2761 (source selection authority decision brief), 2887-88 (source selection decision showing overall adjustment and specifically discussing the addition of transition costs).

On March 4, 2016, the source selection authority, Michael G. Therrien, determined to award the AFMSTT contract (contract no. FA8730-16-D-0001) to Cole. AR 2889.  Mr. Therrien found that Cole's proposal offered "advantages . . . in the Test and Integration Technical Subfactor and Cost/Price Factor."  AR 2888.  Mr. Therrien also found that AEgis's proposal and the other awardable proposal offered "no advantages . . . that would justify the higher cost over the [Cole] proposal."  AR 2888.  Mr. Therrien therefore concluded that "[Cole's] proposal clearly presents the best value for the Government."  AR 2888.  The Air Force awarded the contract and delivery order to Cole on March 11, 2016.  AR 6-7.

### C.    Protest before the Government Accountability Office

AEgis and another unsuccessful bidder filed protests before the Government Accountability Office ("GAO").  AR 3143 (B-412884; B-412884.2; B-412884.3; B-412884.4).  AEgis filed its initial protest on March 21, 2016, AR 77, and a supplemental protest on April 27, 2016, AR 2950.

In its initial protest before the GAO, AEgis argued, among other things, that the Air Force had erred by assigning Cole a "low" technical risk rating for the system development and sustainment technical subfactor on the grounds that a low risk rating required "little potential to cause . . . increased cost" and that "the Air Force made an upward adjustment of [Cole's] cost proposal for the Technical Subfactor of System Development & Sustainment of 64% based on cost realism."  AR 80-81.  AEgis also argued in its initial protest that the Air Force unreasonably assigned both AEgis and Cole a past performance rating of "substantial confidence," "ignoring the significant

11

difference" that AEgis had more "recent/relevant performance" as the incumbent contractor.  AR 100-01.

In its supplemental protest, AEgis asserted that Booz Allen had a significant OCI arising from its performance of the AFAMS support services contract.  AR 2968-72. Specifically, AEgis argued that "[i]f, in its waning months as an AFAMS support contractor, [Booz Allen] was scheming to joining [Cole's] team to perform AFMSTT," Booz Allen might have provided policy advice to the Air Force that could have benefited Cole and itself.  AR 2972.  AEgis also stated that Booz Allen might have had unequal access to non-public information or might have impaired objectivity.  AR 2972.[12]  AEgis

---

[12] In support of its OCI arguments, AEgis relied on a description, from Cole's proposal, of Booz Allen's past performance in providing modeling and simulation mission support services for AFAMS, AR 1538, and a declaration from Stephen J. Swenson, AEgis's Vice President of Eastern Operations, who was responsible for the performance of the predecessor contract awarded to AEgis for the AFMSTT program, AR 3077-81.  In his declaration, Mr. Swenson stated that Booz Allen "participated directly in the authorship and adjudication of AFMSTT user requirements" as part of its responsibility for "designing, implementing and overseeing AFAMS' Modeling and Simulation Warfighter Operational Database (MSWORD)."  AR 3079.  Mr. Swenson also stated that Booz Allen might have "influenc[ed] . . . work orders" for the AFMSTT program in providing technical advice under its AFAMS contract.  AR 3080.  Mr. Swenson continued that Booz Allen "had direct access to price/cost data, pricing/estimation models, and business processes" and was "also made aware of portions of AEgis's strategic plan" through participation in AEgis program management reviews or through its support of AFAMS business operations.  AR 3078-79.  Mr. Swenson further stated that because Booz Allen "participated in the configuration management process" and "oversaw testing" of the AFMSTT program, Booz Allen would have had "insight into AEgis's proprietary software development processes" and "insight into AEgis's internal testing capabilities, software development, and systems engineering processes."  AR 3079.  Mr. Swenson stated that Booz Allen "was potentially unable to be impartial" as an AFAMS support contractor and potential AFMSTT subcontractor and "may have been reluctant to impose stringent user requirements on AFMSTT procurements knowing that those stringent requirements would soon be a burden to [Cole]/[Booz Allen]."  AR 3080.  Mr. Swenson also stated that Booz Allen "was potentially unable to be impartial in . . . their technical and operational advice" and "could potentially . . . indirectly posture the incoming AFMSTT developer to receive more work as well as the more profitable work."  AR 3080.  Finally, Mr. Swenson stated that Booz Allen "had an incentive to be unduly

also argued in its supplemental protest before the GAO that the Air Force's cost realism evaluation was inadequate because the Air Force did not compare Cole's proposed costs to the government cost estimate.  AR 2951.  Finally, AEgis objected in its supplemental protest to Cole's "substantial confidence" past performance rating on the grounds that the Air Force gave too much weight to the past performance of Cole's proposed subcontractors.  AR 2973.

The Air Force filed lengthy responses to AEgis's initial protest and supplemental protest before the GAO.  First, with regard to AEgis's objection to the Air Force's technical risk analysis on the grounds that the Air Force's cost realism adjustment for Cole's proposal required a higher risk rating for the system development and sustainment technical subfactor, the contracting officer stated that the cost adjustment "was not meaningful enough to raise the risk rating above low, as it only pertains to the first 90 day transition period, and not the full 5-year contract period of performance."  AR 41 (citation to the record omitted); *see also supra* note 7 (discussing the Air Force's rationale for this rating in the source selection decision).  The contracting officer then explained that the Air Force's "low" technical risk rating for Cole's proposal was consistent with the standards described in the solicitation because "[t]he Air Force determined that [Cole's] transition plan and normal Air Force monitoring will likely overcome any difficulties associated with transition execution during the 90 day period."

---

critical of AEgis's performance" to make it "easier for [Cole] and [Booz Allen] to replace AEgis as the [AFMSTT] contractor."  AR 3080.

AR 41 (citations to the record omitted).  Thus, the contracting officer stated that because "[Cole] demonstrated a thorough understanding of the requirements it was properly rated as 'Good (Purple)' with a 'Low' risk for this Subfactor in accordance with the Evaluation Criteria."  AR 41 (citation to the record omitted).

Second, with regard to AEgis's argument that the Air Force unreasonably assigned both AEgis and Cole a past performance rating of "substantial confidence" despite AEgis's experience as the incumbent contractor, the contracting officer stated that "[w]hile [AEgis] was the incumbent of the AFMSTT contract, and the Air Force fully considered its past performance, [AEgis's] incumbency does not disqualify other offerors from also receiving substantial confidence assessments."  AR 70-71.

Third, with regard to AEgis's OCI allegations, the contracting officer stated that "[w]hile [Booz Allen] held the M&S Mission Support Services contract at AFAMS, there was unequivocally no conflict of interest determined by the Air Force."  AR 3008.  The contracting officer noted that Booz Allen's work under the AFAMS contract "had no effect on the AFMSTT source selection."  AR 3008.  The contracting officer indicated that the Air Force had reviewed Booz Allen's role in supporting AFMSTT exercises and testing and concluded that it "clearly does not provide any conflict of interest."  AR 3011. The contracting officer found that "[Booz Allen's] participation in these events reflect how they supported efforts on the current AFMSTT contract in accordance with the requirements under their own AFAMS support contract, but were in no way affiliated with the [AFMSTT] source selection process."  AR 3011.

The contracting officer, in the response, also stated that Booz Allen was not involved in drafting requirements or evaluating proposals under the AFMSTT solicitation "and therefore did not have a conflict of interest, specifically concerning impaired objectivity."  AR 3008, 3010.  The contracting officer further determined that Booz Allen "had no conflicts of interest specifically involving unequal access or biased ground rules regarding any documentation, since all requirements, draft or otherwise, were released to the public as they were made available by the Air Force Program Office."  AR 3010.  In this connection, the contracting officer noted that "information regarding the requirements was released serially throughout their development to all interested parties" and "the program office made an extensive bidder's library containing business, planning, and technical data, and software available to potential offerors in the run up to the source selection."  AR 3012.

The contracting officer also addressed in the response whether Booz Allen might have had access to AEgis's proprietary information.  AR 3012.  The contracting officer noted that "[a]ll AFMSTT technical data is possessed with no less than Government Purpose rights, and all software is either Unlimited Rights licensed or is commercial software, none of which is proprietary to [AEgis]."  AR 3012.  The contracting officer also stated that "[t]he only proprietary data [AEgis] would have generated under the incumbent contract would have been financial or business information necessary to

administer a cost contract" and that "[t]here simply would be no reason to disclose this information to [Booz Allen] in performance of its AFAMS contract."  AR 3012.[13]

Fourth, with regard to AEgis's cost realism argument, the contracting officer explained that AEgis's objection was based on the faulty assumption that the solicitation required the Air Force to compare Cole's proposed costs to the government cost estimate. AR 2996-99.  The contracting officer acknowledged that Cole's proposed cost was lower than the government cost estimate but explained that "comparing [Cole's] cost proposal to the Government Estimate or [AEgis's] proposed cost . . . would be categorically incorrect and not in accordance with the solicitation."  AR 2998 (citations to the record omitted).[14]  The contracting officer stated that the Air Force evaluated each proposal independently "based on the content of the proposal," based on "the DoD Source Selection Procedures."  AR 2998 (citation to the record omitted).  The Air Force did not

---

[13] Cole also submitted a response to the GAO addressing AEgis's OCI allegations.  AR 3126-31.  Cole's response included declarations from Scott C. Johnston, lead associate at Booz Allen and task lead for Booz Allen's AFAMS contract, AR 3135-37, and Matthew J. Thompson, Cole's chief operating officer, AR 3139-41.  In his declaration, Mr. Johnston stated that Booz Allen "did not generate [change requests] or [deficiency reports]; did not write or review AFMSTT source code; did not have access to AFMSTT contractor price/cost data, pricing estimation models, or source code; and did not draft any aspect of [Cole's] proposal in response to the AFMSTT Solicitation."  AR 3137.  Mr. Thompson stated in his declaration that Cole signed a teaming agreement with Booz Allen on July 29, 2015, months after Booz Allen ended performance on the AFAMS contract.  AR 3140.  Mr. Thompson also stated that "[Cole] personnel drafted its proposal in response to the AFMSTT Solicitation," relying "on information contained in the AFMSTT Solicitation, including the source code contained in the bidder's library, to develop its approach."  AR 3141.  At oral argument, the government clarified that the contracting officer in conducting her OCI evaluation did not rely on these declarations, which were submitted after the Air Force's response to the GAO.

[14] Instead, the government cost estimate "was used primarily as a baseline to determine balanced [line item] prices."  AR 2996 (citation to the record omitted).

compare proposals to other proposals.  AR 2998.  The contracting officer explained that

the Air Force's cost realism analysis and adjustments were based on the Air Force's

assessment of "whether an offeror's proposal was understaffed (not enough hours),

staffed with incorrect skill mixes, or otherwise required an adjustment" in light of the

offeror's technical approach and "actual performance in prior years on the program or

other analogous programs."  AR 2996-97 (citation to the record omitted).  The

contracting officer then described the Air Force's cost adjustments for Cole's proposal,

which the contracting officer stated were "based on the subjective, professional

judgement of the evaluators."  AR 2997-98 (citations to the record omitted).

Finally, with regard to AEgis's argument that the Air Force's past performance

evaluation gave too much weight to the past performance of Cole's subcontractors, the

contracting officer explained that offerors were required to submit past performance "for

the offeror and all subcontractors who will perform in excess of 25% or were proposed to

perform aspects of the effort the Offeror considers critical to overall successful

performance."  AR 3015-16.  The contracting officer explained that although Cole's

proposed subcontractors would perform less than 25% of the work for the initial delivery

order, the Air Force determined that "[e]ach of the four [subcontractors] that [Cole]

proposed is estimated to complete 10% of the work over the life of the 5 year ID/IQ

contract totaling 40% of the effort."  AR 3016.

### D.    GAO Decision Denying AEgis's Protest

On June 28, 2016, the GAO denied AEgis's protest.  AR 3143-54; Pl.'s Mot. for J.

on the Admin. R. ("MJAR") 2; Def.'s MJAR 11.  With regard to AEgis's argument that

the Air Force did not explain its cost realism analysis, the GAO found the Air Force's cost realism evaluation was supported by the record.  AR 3146-47 n.5.  The GAO also found that AEgis's objection to Cole's "low" technical risk rating for the system development and sustainment technical subfactor was unfounded.  AR 3148 (citations to the record and GAO cases omitted).  With regard to AEgis's arguments regarding past performance evaluations, the GAO found that "[a]lthough AEgis had more contracts than Cole that were assessed as very relevant with very good past performance, AEgis has failed to show how the [Air Force] was remiss in assigning an overall rating of substantial confidence to Cole."  AR 3149.  Because AEgis did not allege any violation of the solicitation or the FAR, or object to "the underlying relevance or performance ratings" for the Air Force's past performance evaluation, the GAO found "no basis to sustain the protest."  AR 3149.

The GAO found that AEgis's remaining objections, including its OCI objections, did not provide a basis to sustain the protest.  AR 3146.  The GAO did not however discuss AEgis's OCI arguments in its decision.  AR 3146.

### E.    Procedural History

AEgis filed its complaint in this case on July 21, 2016.  On the same day, AEgis filed a motion for preliminary injunction.  On July 22, 2016, defendant-intervenor Cole filed an unopposed motion to intervene.  On July 25, 2016, the court granted Cole's unopposed motion to intervene and based on the government's representations that work under the current contract will continue with AEgis's existing employees until September 30, 2016, AEgis's motion for a preliminary injunction was denied as moot.

Briefing on cross-motions for judgment on the administrative record was completed on September 8, 2016.  The court heard oral argument on September 16, 2016.

## II.   JURISDICTION AND LEGAL STANDARDS

Under the Tucker Act, as amended, this court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  It is undisputed that AEgis is an interested party because AEgis was an actual offeror whose direct economic interest is affected by the award of the contract to Cole.  *See Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015).

In a bid protest action, the court reviews an agency's procurement decision pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4).  An agency's procurement decision is to be set aside only if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *E.g.*, *Per Aarsleff A/S v. United States*, No. 2015-5111, 2016 WL 3869790, at *3 (Fed. Cir. June 23, 2016) (citing *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)).  This standard is "highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  The court must determine "whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." *Tinton Falls*, 800 F.3d at 1358 (citing

*Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed.Cir.2010)); *see also PAI Corp.*, 614 F.3d at 1351 (Fed. Cir. 2010) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).  An agency's decision is "arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  If the court finds that "the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract . . . then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  RCFC 52.1 provides for review of agency action based upon an administrative record.

## III.   DISCUSSION

### A.   AEgis Has Not Provided Hard Facts Showing Significant OCI.

AEgis argues that the award to Cole must be set aside because Booz Allen is ineligible to serve as a subcontractor for Cole due to significant OCI.  AEgis makes three arguments regarding OCI.  The court examines each in turn.

### 1.   Biased Ground Rules OCI under FAR § 9.505-1

"The biased ground rules category of OCIs focuses on the concerns that a company may, by participating in the process of setting procurement ground rules, have

special knowledge of the agency's future requirements that may skew the competition in its favor." *Turner Const. Co. v. United States*, 645 F.3d 1377, 1382 (Fed. Cir. 2011). Under FAR § 9.505-1(a), "[a] contractor that provides systems engineering and technical direction for a system but does not have overall contractual responsibility for its development, its integration, assembly, and checkout, or its production shall not . . . be a subcontractor or consultant to a supplier of the system or any of its major components."[15] FAR § 9.505-1(b) states that "[i]n performing these activities, a contractor occupies a highly influential and responsible position in determining a system's basic concepts and supervising their execution by other contractors."  To show a violation under FAR § 9.505-1, the FAR requires that a bidder or subcontractor be "in a position to make decisions favoring its own products or capabilities" by providing "systems engineering" and "technical direction" for the relevant program.  FAR § 9.505-1.  FAR § 9.505-1(b) defines "systems engineering" as "a combination of substantially all of the following activities: determining specifications, identifying and resolving interface problems, developing test requirements, evaluating test data, and supervising design."  FAR § 9.505-1(b) then defines "technical direction" as "a combination of substantially all of the following activities: developing work statements, determining parameters, directing other contractors' operations, and resolving technical controversies."[16]

---

[15]  The government does not dispute that the AFMSTT program is a "system" for the purposes of FAR § 9.505-1.

[16] FAR § 9.508 provides the following examples of OCI arising from a contractor providing systems engineering and technical direction:

AEgis argues that Booz Allen provided systems engineering and technical direction on AFMSTT based on a description, from Cole's proposal, of Booz Allen's past performance in providing modeling and simulation mission support services for AFAMS. AR 1538.  AEgis asserts that Booz Allen provided systems engineering and technical direction for the AFMSTT program, such as by "exploring new Warfighter concepts, roles, and missions"; "establishing architectures, interoperable databases, protocols, and standards"; and providing technical and operational subject matter expertise to AFAMS on training models and simulations including the AFMSTT program.  AR 1538-42.

AEgis also relies on the declaration of Stephen J. Swenson, AEgis's Vice President of Eastern Operations, who was responsible for the performance of the predecessor contract awarded to AEgis for the AFMSTT program.  AR 3077-81.  In his declaration, Mr. Swenson stated that Booz Allen "participated directly in the authorship and adjudication of AFMSTT user requirements" as part of its responsibility for "designing, implementing and overseeing AFAMS' Modeling and Simulation Warfighter

(a) Company A agrees to provide systems engineering and technical direction for the Navy on the powerplant for a group of submarines (i.e., turbines, drive shafts, propellers, etc.).  Company A should not be allowed to supply any powerplant components.  Company A can, however, supply components of the submarine unrelated to the powerplant (e.g., fire control, navigation, etc.).  In this example, the system is the powerplant, not the submarine, and the ban on supplying components is limited to those for the system only.

(b) Company A is the systems engineering and technical direction contractor for system X.  After some progress, but before completion, the system is canceled.  Later, system Y is developed to achieve the same purposes as system X, but in a fundamentally different fashion.  Company B is the systems engineering and technical direction contractor for system Y.  Company A may supply system Y or its components.

Operational Database (MSWORD)." AR 3079.  Mr. Swenson also stated that Booz Allen

might have "influenc[ed] . . . work orders" for the AFMSTT program in providing

technical advice under its AFAMS contract.  AR 3080.

The government, relying on the Air Force's response to AEgis's supplemental

protest before the GAO, argues that the contracting officer considered and rejected the

possibility that Booz Allen's work supporting AFAMS involved a potential for biased

ground rules under FAR § 9.505-1.  According to the government, the administrative

record before the court shows that Booz Allen did not have a role in providing systems

engineering or technical direction for the AFMSTT, which is necessary to show a

violation of FAR § 9.505-1(b).  The government argues that regardless of how Cole

presented Booz Allen's role under its prior AFAMS contract, AEgis has failed to present

any hard facts demonstrating that Booz Allen provided systems engineering and technical

direction on AFMSTT or was otherwise in a position to set biased ground rules for the

AFMSTT solicitation through the AFAMS contract.

The court finds that AEgis has failed to provide hard facts to show that Booz

Allen's potential participation as a Cole subcontractor would violate FAR § 9.505-1.

There is no indication in the record that Booz Allen was in the type of "highly influential

and responsible position in determining a system's basic concepts," that could create

biased ground rules OCI under FAR § 9.505-1.  For example, the portion of the record

quoted by AEgis to show that Booz Allen provided systems engineering and technical

direction on AFMSTT expressly states that Booz Allen "served in an observation and

requirements capturing role" in supporting AFAMS.  AR 1538.  The fact that Booz Allen

collected and tracked the change requests and deficiency reports used in the AFMSTT

program is not proof that Booz Allen developed work statements or determined

parameters for the AFMSTT program, directed the operations of other contractors such as

AEgis, or resolved technical controversies.  To the contrary, the record shows that Booz

Allen, under its AFAMS contract, did not determine specifications, develop test

requirements, or supervise design for the AFMSTT program.  *See, e.g.*, AR 3176 ("This

[AFAMS task order] does not support the development of the simulations [used by the

Air Force for testing the AFMSTT program], but provides support to both the developers

and the users.").  As such, there is no proof that Booz Allen could have played a role in

designing specifications or developing test requirements that could result in biased

ground rules.  Accordingly, there is no proof that Booz Allen's potential role as one of

Cole's proposed subcontractors violates the OCI rules set in FAR § 9.505-1.

In *Turner Construction Co. v. United States*, 645 F.3d at 1387 (quoting *PAI Corp.*,

614 F.3d at 1352), the Federal Circuit held that "an OCI must be based on 'hard facts; a

mere inference or suspicion of an actual or apparent conflict is not enough.'"  At bottom,

AEgis's biased ground rules OCI arguments are assertions based on "mere inference or

suspicion" are therefore inadequate to establish OCI under this Federal Circuit precedent.

AEgis has failed to establish OCI based on a violation of FAR § 9.505-1.

## 2.    Unequal Access OCI

In order to establish an unequal access OCI, there must be "access to non-public

information that is competitively useful."  *Turner Constr.*, 645 F.3d at 1387 (citing

*Axiom*, 564 F.3d at 1377 n.1); *see also* FAR §§ 9.505(b)(2) ("[A]n unfair competitive

advantage exists where a contractor competing for award for any Federal contract possesses . . . [s]ource selection information . . . that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract."), 9.505-4 (providing general rules for obtaining access to proprietary information).

AEgis relies on Mr. Swenson's declaration in support of its unequal access OCI argument. AR 3077-81. Mr. Swenson stated in his declaration that Booz Allen "had direct access to price/cost data, pricing/estimation models, and business processes" and was "also made aware of portions of AEgis's strategic plan" through participation in AEgis program management reviews or through its support of AFAMS business operations. AR 3078-79. Mr. Swenson further stated that because Booz Allen "participated in the configuration management process" and "oversaw testing" of the AFMSTT program, Booz Allen would have had "insight into AEgis's proprietary software development processes" and "insight into AEgis's internal testing capabilities, software development, and systems engineering processes." AR 3079. In other words, AEgis argues that Booz Allen had "insider information" about the structure of the AFMSTT program and future requirements based on Booz Allen's access to change requests and deficiency reports submitted by AFMSTT users. Pl.'s Reply 5.

The government argues that the contracting officer addressed the issue of unequal access in the Air Force's response to AEgis's supplemental protest before the GAO. In that response, the contracting officer explained that "information regarding the requirements was released serially throughout their development to all interested parties"

25

and "the program office made an extensive bidder's library containing business, planning, and technical data, and software available to potential offerors in the run up to the source selection." AR 3012. Before the GAO, the Air Force argued that it created the bidder's library specifically "to blunt any informational edge and ensure a fair competition." AR 3014.

The government also argues that the contracting officer expressly rejected AEgis's claim that Booz Allen might have had access to AEgis's proprietary information. AR 3012. The contracting officer noted that "[a]ll AFMSTT technical data is possessed with no less than Government Purpose rights, and all software is either Unlimited Rights licensed or is commercial software, none of which is proprietary to [AEgis]." AR 3012. The contracting officer also stated that "[t]he only proprietary data [AEgis] would have generated under the incumbent contract would have been financial or business information necessary to administer a cost contract" and that "[t]here simply would be no reason to disclose this information to [Booz Allen] in performance of its AFAMS contract." AR 3012. In view of the foregoing, the government contends that AEgis has failed to provide hard facts demonstrating unequal access to information.

The court agrees with the government that AEgis has failed to provide hard facts showing that Booz Allen gained an unfair competitive advantage through unequal access to non-public information. The court recognizes that Booz Allen, as part of its AFAMS contract, had access to change requests and deficiency reports submitted by AFMSTT users. However, in the AFMSTT solicitation, the Air Force recognized that different offerors might have had different access to information and thus provided information

26

about AFMSTT future requirements and the AFMSTT software code to all offerors in a

bidder's library.  AR 347, 349, 369, 3012, 3023.  "It is well-established that an

appropriate measure for an agency to take to remedy a potential 'unequal access to

information' OCI is to disclose the nonpublic information."  *Ala. Aircraft Indus.*, 83 Fed.

Cl. at 690 (citing *Sierra Military Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 583

(2003)).  Even if Booz Allen had a better understanding of the AFMSTT program by

virtue of its earlier access to the change requests and deficiency reports, "[t]he mere

existence of a prior or current contractual relationship between a contracting agency and

a firm does not create an unfair competitive advantage, and an agency is not required to

compensate for every competitive advantage gleaned by a potential offeror's prior

performance of a particular requirement . . . "  *PAI Corp.*, 614 F.3d at 1353-54 (citing

*Ala. Aircraft Indus.*, 83 Fed. Cl. at 686; *ARINC Eng'g Servs., LLC v. United States*, 77

Fed. Cl. 196, 203 (2007)).  Therefore, AEgis's unequal access OCI argument on this

ground fails.

In addition, the court finds that AEgis has not presented hard facts showing that

Booz Allen had access to AEgis's proprietary information.  As discussed above, the

contracting officer in the response before the GAO stated that the only proprietary

information AEgis would have generated under its incumbent contract would have been

financial or business information.  AR 3012.  While Booz Allen provided business

operations support to AFAMS, AR 3180-85, the contracting officer concluded that there

was no reason AEgis's financial or business information would have been disclosed to

Booz Allen under Booz Allen's AFAMS contract.  AR 3012.  AEgis has not presented

any hard evidence to refute this conclusion.  As such, AEgis's unequal access OCI argument on this ground also fails.

### 3.     Impaired Objectivity OCI

In order to show an "impaired objectivity" OCI, there must be hard facts showing that "a government contractor's 'work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 687-88 (2008) (quoting *Aetna Gov't Health Plans, Inc., Found. Health Fed. Servs., Inc.*, B-254397 (Comp. Gen. July 27, 1995)), *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009); *see also* FAR § 9.505(a) (providing that an underlying principle of the FAR's OCI rules is "[p]reventing the existence of conflicting roles that might bias a contractor's judgment").  *See generally* Daniel I. Gordon, Organizational Conflicts of Interest: A Growing Integrity Challenge, 35 Pub. Cont. L.J. 25, 32 (2005) (discussing OCI issues raised in bid protests).

AEgis asserts, again based on Mr. Swenson's declaration, that Booz Allen "was potentially unable to be impartial" as an AFAMS support contractor and potential AFMSTT subcontractor and "may have been reluctant to impose stringent user requirements on AFMSTT procurements knowing that those stringent requirements would soon be a burden to [Cole]/[Booz Allen]."  AR 3080.  AEgis also argues that Booz Allen "was potentially unable to be impartial in . . . their technical and operational advice" and "could potentially . . . indirectly posture the incoming AFMSTT developer to receive more work as well as the more profitable work."  AR 3080.  Finally, AEgis

argues that Booz Allen "had an incentive to be unduly critical of AEgis's performance" to make it "easier for [Cole] and [Booz Allen] to replace AEgis as the [AFMSTT] contractor." AR 3080.

The contracting officer, in the Air Force's response to AEgis's protest before the GAO, stated that Booz Allen "did not have a conflict of interest, specifically concerning impaired objectivity," mainly because Booz Allen was not involved in evaluating proposals under the AFMSTT solicitation. AR 3008.

AEgis's allegations with respect to Booz Allen's allegedly impaired objectivity are based on "mere inference or suspicion" and are therefore also insufficient to prove OCI under *Turner Construction*, 645 F.3d at 1387. AEgis has not presented any hard facts to show that Booz Allen actually imposed stringent requirements on AFMSTT procurements, postured the incoming AFMSTT developer to receive more work or more profitable work, or was unduly critical of AEgis's performance. Instead, as discussed above, the record shows that Booz Allen did not draft requirements or determine changes to the AFMSTT program. AR 1538-42, 3155-3215. There is also no evidence of undue criticism; the Air Force's evaluation of AEgis's past performance in the AFMSTT competition resulted in an overall assessment of "substantial confidence." AR 2384; *see also* AR 2380-2420 (initial evaluations of AEgis's past performance), 2943-44 (discussing the Air Force's rationale for rating AEgis's past performance of the AFMSTT

contract as "very good"). In short, there is no indication that Booz Allen was in a position to favor or evaluate itself with respect to the AFMSTT contract.[17]

**B.     The Air Force's Cost Realism Assessment and Technical Risk Rating for Cole's System Development and Sustainment Technical Subfactor were not Arbitrary or Capricious.**

AEgis argues that the Air Force's cost realism analysis was arbitrary and capricious on the grounds that the record does not adequately explain the Air Force's $0.42 million in adjustments to Cole's proposed costs, in particular in light of the gap between Cole's proposed costs of $2.97 million and the government cost estimate of $6.36 million. In addition, AEgis asserts that the Air Force violated the terms of the solicitation by assigning Cole's system development and sustainment technical approach a "low" risk rating, which required little potential of increased cost, because the Air Force acknowledged in its cost realism analysis that Cole's proposed cost needed to be adjusted and because Cole's proposed cost was significantly less than the government estimate. As AEgis's counsel conceded at oral argument, AEgis's argument is essentially that the Air Force's cost realism analysis and technical risk analysis were not thorough enough,

---

[17] Because the court finds no support in the record for AEgis's argument that Booz Allen has a significant conflict of interest, the court finds no merit in AEgis's additional argument that the contracting officer violated FAR § 9.504 by failing to identify and evaluate potential OCI as early in the acquisition process as possible and avoid, neutralize, or mitigate significant potential OCI before contract award. The court finds that the OCI evaluation done in response to the GAO protest satisfies the contracting officer's obligations. *See Turner Constr.*, 645 F.3d at 1386-87 (finding that the court "did not err by considering the [contracting officer's] post-protest investigation and analysis" and noting that "[c]ourts reviewing bid protests routinely consider post-award OCI analyses and consider evidence developed in response to a bid protest").

mainly because the Air Force did not consider the difference between the government cost estimate and the Air Force's cost adjustments to Cole's proposal.

The government argues that the Air Force's cost realism analysis was consistent with the terms of the solicitation and is explained adequately in the record. In addition, the government argues that the Air Force would have violated the terms of the solicitation if the Air Force had compared Cole's costs to the government cost estimate in its cost realism analysis or technical risk assessment. The government also argues that its technical risk evaluation is supported and that the Air Force's adjustment to Cole's costs did not mean that Cole's proposed approach presented more than "little potential to cause disruption of schedule, increased cost, or degradation of performance" and that "[n]ormal contractor effort and normal Government monitoring" would not "likely be able to overcome any difficulties." AR 536; *see also supra* note 7 (discussing the Air Force's rationale for this rating in the source selection decision).

The court finds, as did the GAO, that AEgis's arguments are without merit. To begin, it is clear, as the GAO found, that the Air Force documented its cost realism evaluation. AR 3146-47 n.5; *see also* AR 2516-17 (initial evaluation), 2844 (proposal analysis report), 2761 (source selection authority decision brief), 2880, 2887 (source selection decision). AEgis's contention that the Air Force should have noted that Cole's costs were significantly lower than the government cost estimate does not alter the court's conclusion. First, as the GAO noted, "the arguments presented suggest that AEgis may have conflated the government estimate, i.e., the agency's initial projection of the cost of performing the first delivery order, with individual offeror[s'] GEMPCs,

where the agency adjusted each offeror's estimated costs based on its proposed technical approach." AR 3146-47 n.5. Second, the court will not second guess the depth of the Air Force's cost realism analysis. "[T]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation." *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009).

With regard to AEgis's objection to the Air Force's technical risk analysis, the court agrees with the government. The Air Force's risk evaluation is well documented. *See* AR 2441 (initial evaluation), 2818 (proposal analysis report), 2879 (source selection decision); *see also* AR 2696 (source selection authority decision brief discussion of the strengths and weaknesses identified for Cole's technical approach). In addition, the Air Force's technical risk evaluation expressly took into account the cost realism adjustment and found that the adjustment "was not meaningful enough to raise the risk rating above low." AR 2880.

Because the Air Force's cost realism evaluation and technical risk evaluation of Cole's proposal are consistent with the requirements of the solicitation and are supported by the record, the court finds that AEgis's arguments must be rejected.

### C. The Air Force's Past Performance Evaluation Was Not Arbitrary or Capricious.

Finally, AEgis asserts that Cole's score of "substantial confidence" for past performance was unreasonable because the rating was based on a "bait and switch." Specifically, AEgis contends that Cole's high score was predominantly attributable to the

past performance of Cole's subcontractors even though the subcontractors will be performing less than 25% of the work.  In addition, AEgis argues that the Air Force unequally evaluated AEgis's past performance and Cole's past performance by assigning the same past performance rating of "substantial confidence" to AEgis and Cole although AEgis had more contracts evaluated as "very relevant" and "very good."  AEgis claims that this violated the terms of the solicitation, which stated that the government would consider the relevancy of past performance, AR 541, and FAR § 15.305(a)(2)(i), which generally requires an agency to consider the "currency and relevance" of past performance information, among other things, in evaluating past performance.  AEgis also cites *Johnson Controls World Servs., Inc.; Meridian Mgmt. Corp.*, B-281287.5 (Comp. Gen. June 21, 1999), in which the GAO found that an agency unreasonably gave identical past performance scores to offerors with "significant differences" in relevant experience.

The government argues that the solicitation did not require the Air Force to give a specific weight to past performance by Cole as opposed to past performance by Cole's proposed subcontractors.  Moreover, the government asserts that the Air Force's past performance ratings for Cole and AEgis are supported by the record.

The court agrees with the government.  Agencies have "'broad discretion' in evaluating past performance information, including the extent to which a prior contract is considered 'relevant.'"  *Innovative Test Asset Sols. LLC v. United States*, 125 Fed. Cl. 201, 226 (2016) (quoting *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 910-11 (Fed. Cir. 2013).  The Air Force's "determination of relevance is owed

deference as it is among 'the minutiae of the procurement process,' which this court 'will not second guess.'" *Glenn Def. Marine*, 720 F.3d at 911 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 718 (2010); *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010)).

Here, AEgis has not shown any violation of the FAR or solicitation requirements in the Air Force's evaluation of past performance. The solicitation, AR 355, 540-42, and FAR § 15.305, expressly envision that the Air Force would consider recent, relevant past performance by offerors' proposed subcontractors. In the Air Force's response to AEgis's supplemental protest before the GAO, the contracting officer acknowledged that Cole's proposed subcontractors would perform less than 25% of the work for the initial delivery order. AR 3016. However, the contracting officer explained that the Air Force determined that "[e]ach of the four [subcontractors] that [Cole] proposed is estimated to complete 10% of the work over the life of the 5 year ID/IQ contract totaling 40% of the effort." AR 3016. The solicitation did not limit the Air Force's past performance evaluation to matters concerning only the initial delivery order. AR 540-43. AEgis cannot, at this stage in the procurement process, challenge the requirements of the solicitation itself. *See Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) ("A bidder that challenges the terms of a solicitation in the Court of Federal Claims generally must demonstrate that it objected to those terms 'prior to the close of the bidding process.'" (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007)).

The court also finds that AEgis's reliance on *Johnson Controls*, B-281287.5
(Comp. Gen. June 21, 1999), to support its contention that Cole should not have received
the same rating as AEgis is misplaced.  In *Johnson Controls*, the GAO found that an
agency unreasonably gave identical past performance scores to one offeror that
"demonstrated successful prior performance on contracts of the same or greater
complexity on every one of the major functions" and another offeror that "fail[ed] to
identify experience in many of the major functions," while downgrading the past
performance rating for a third offeror that failed to identify a particular type of contract
experience.  *Id.* (concluding that this error "effectively removed the evaluation weight
assigned this subfactor").  In this case, AEgis received a past performance rating of
"substantial confidence" based on three "very relevant" contracts and one "somewhat
relevant" contract that were each evaluated to be "very good."  AR 2885-86.  One of
AEgis's "very relevant" efforts was performed by a proposed subcontractor.  AR 2886.
Cole received a rating of "substantial confidence" based on three "very relevant"
contracts, evaluated as "satisfactory" quality; four "relevant" contracts, evaluated as
"exceptional and "very good" quality; and two "somewhat relevant" contracts that were
evaluated as "very good" and "satisfactory."  AR 2886.  The source selection authority
noted that Cole's proposed subcontractors were responsible for some of Cole's "very
relevant" past performance and past performance that earned "exceptional" and "very
good" ratings.  Cole had identified more very relevant and relevant past performance and
therefore was found to have "a slight advantage over AEgis."  AR 2888.  Based on this
record, the court cannot say that the Air Force "entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus.*, 586 F.3d at 1375 (citation omitted).  The Air Force's past performance rating is supported by the record.  AEgis's objection to the rating amounts to nothing more than a disagreement with the Air Force's assessment and thus must be rejected.

## IV.    CONCLUSION

For the reasons above, AEgis's motion for judgment on the administrative record is **DENIED**.[18]  The government's and Cole's cross-motions for judgment on the administrative record are **GRANTED**.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.


s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

[18] AEgis's pending motion requested permanent injunctive relief under 28 U.S.C. § 1491(b)(2).  In addition, AEgis filed a motion (ECF No. 34) to strike the declaration of Joshua G. Hurst, program manager for AFMSTT, which the government relied on in its opposition to AEgis's request for permanent injunctive relief.  Because AEgis has failed to establish success on the merits, it is not entitled to permanent injunctive relief.  *See, e.g.*, *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  In addition, because the court finds that AEgis is not entitled to permanent injunctive relief, AEgis's motion to strike is **DENIED AS MOOT**.